IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KENNETH POSKIN, FINIAN POSKIN,<br>his wife also known as POSKIN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action 06-463 |
| | ) | |
| TD BANKNORTH, N.A., formerly known as<br>Banknorth, N.A., formerly known as Peoples<br>Heritage Bank, N.A., and COASTAL<br>FINANCIAL INC., t/d/b/a FIRST<br>MANUFACTURED LOAN, RANDY R.<br>McKINNEY, individually and in his capacity as<br>an agent of Coastal Financial Inc.; DAVID M.<br>DOHENY, individually and in his capacity as an<br>agent of Coastal Financial Inc.; LINDA<br>AMBROSE, individually and in her capacity as<br>an agent of Coastal Financial Inc.; LEIGHTON<br>COHEN, individually and in his capacity as<br>agent of Coastal Financial Inc.; and ANTHONY<br>SALAMONE, individually and in his capacity<br>as agent and/or owner of Coastal Financial Inc., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

CONTI, District Judge,

In this memorandum opinion, the Court considers the motion for summary judgment

(Doc. No. 70), filed by defendant TD Banknorth, N.A. ("defendant" or "Banknorth") with

respect to the seven claims asserted against defendant by plaintiffs Kenneth Poskin and Finian

Poskin ("plaintiffs" or "Poskins") and the unjust enrichment counterclaim asserted against

plaintiffs by defendant.  After considering the Combined Statement of Undisputed Material Facts

(Doc. No. 81)[1] and the parties' respective submissions, the court will grant defendant's motion

for summary judgment with respect to Finian Poskin's claims asserted in count V (violation of

the Pennsylvania Unfair Trade Practices and Consumer Protection Law), count VIII (breach of

fiduciary duty or duty of good faith and fair dealing), and under 15 U.S.C. §§ 1679b(a)(1)(B)(ii)

and 1679b(a)(2)(B)(ii) in count I (violation of the Federal Truth in Lending Act).  The court will

also grant the motion for summary judgment with respect to both plaintiffs' claims in count II

(violation of the Federal Truth in Lending Act), count III (violation of the Federal Real Estate

Settlement Procedures Act), and count IX (violation of state usury laws).  The court denies

summary judgment with respect to Finian Poskin's claims for violation of 15 U.S.C. §

1679b(a)(4) in count I and with respect to all defendant's other arguments, including its request

for summary judgment on the unjust enrichment counterclaim.[2]


### *Factual Background*

Finian Poskin and Kenneth Poskin were married in May 2001 and have divorced since

the initiation of this action. (Def.'s S.F. ¶¶ 2-3).  In April 2001, Kenneth Poskin purchased a

mobile home with money he obtained through a loan with Hudson United Bank ("Hudson

United"). (Def.'s S.F. ¶ 5; Appendix of Exhibits to Defendant's Motion for Summary Judgment

---

[1] The Combined Concise Statement of Undisputed Material Facts consists of defendant's statement of material facts with plaintiff's answers in section I, containing paragraphs 1-69 on pages 1-13, and plaintiff's statement of material facts with defendant's answers in section II, containing paragraphs 1-45 on pages 13-44.  To avoid any confusion that could arise from the duplicative paragraph numbers, citations to section I of the joint statement will be referenced as "Def.'s S.F." followed by the appropriate paragraph number, and citations to section II of the joint statement will be referenced as "Pl.'s S.F." followed by the appropriate paragraph number.

[2] Default judgments were entered against defendants Linda Ambrose and David M. Doheny. (Doc. Nos. 67 and 68.)  The other defendants, Coastal Financial Inc., Randy R. McKinney, Leighton Cohen, and Anthony Salamone, did not file motions for summary judgment.

("Def.'s App'x") (Doc. No. 70), Ex. D at 10-16.)  Plaintiffs wanted to refinance the existing

Hudson United loan, pay off credit cards, and obtain financing to relocate the mobile home.

(Def.'s S.F. ¶ 8.)  Finian Poskin contacted Coastal Financial Inc. ("Coastal") in response to a

solicitation she received in the mail regarding loan financing.  (Def.'s S.F. ¶  7.) Prior to signing

a loan with Coastal, Finian Poskin spoke with a Coastal representative, Randy McKinney, over

the phone regarding plaintiffs' financial standing. (Def.'s App'x, Ex. D at 34-35.)  According to

plaintiffs, Finian Poskin disclosed the unemployment and mental health status of her husband

and her during one of the phone conversations with the Coastal representative.  (Pl.'s S.F. ¶ 18.)

In May 2001, both Finian Poskin and Kenneth Poskin suffered from bipolar mental disability,

and Kenneth Poskin was receiving Social Security benefits for the disorder.  (Def.'s S.F. ¶ 6.)

On September 6, 2001, Finian Poskin and Kenneth Poskin met Randy McKinney at the

Washington County Airport to finalize the execution of the loan.  (Def.'s S.F. ¶ 11; Def.'s

App'x, Ex. D at 36-37.)  Kenneth Poskin signed several documents throughout the course of this

meeting.  (Def.'s S.F. ¶ 12.)  According to plaintiffs, the documents Kenneth Poskin signed were

blank.  (Def.'s S.F. ¶ 14.)  Finian Poskin denies signing any loan documents, and none of the

documents refer to Finian Poskin as a co-borrower.  (Def.'s S.F. ¶ 16; Plaintiff's Reply Appendix

to Motion for Summary Judgment ("Pl.'s App'x") (Doc. No. 75), Ex. C at 77.)

Before Kenneth Poskin executed the Coastal loan, the Poskins purchased a 5.9-acre lot in

Deemston Borough of Washington County, Pennsylvania for $4,000.00.  (Def.'s App'x, Ex. B at

26.)  The purported signature of Finian Poskin appears on a deed dated September 6, 2001,

transferring ownership of the 5.9-acre parcel of land from "FINIAN CROWLEY and

KENNETH W. POSKINS" to "KENNETH W. POSKINS."  (Def.'s App'x, Ex. G.) Kenneth

Poskin's mobile home was the collateral Coastal used for the loan.  (Def.'s S.F. ¶ 15.)

Defendant was previously known as Peoples Heritage Bank, N.A. ("Peoples Heritage").

(Def.'s S.F. ¶ 4.)  Defendant's mailing address was in Maine.  (See Def.'s App'x, Exs. F, J, P.)

After the execution of the September 6, 2001 loan, Coastal assigned the Poskins' loan to Peoples

Heritage.  (Def.'s S.F. ¶ 20.)  Until defendant discovered Coastal sold fraudulent loans to

defendant, Coastal was defendant's sole mobile home loan broker.  (Def.'s S.F. ¶ 30.)  In March

1998, defendant and Coastal entered into a manufactured home direct loan correspondent

purchase agreement.  (Def.'s App'x, Ex. H.)  Tom Prowdy, defendant's vice president of

consumer lending, had a previous relationship with Anthony Salamone, the owner of Coastal,

and Tom Prowdy recommended to defendant that it offer mobile home loans.  (Pl.'s App'x, Ex.

E at 8-11; Pl.'s App'x, Ex. F at 10.)  Coastal and defendant had a relationship in which Coastal

submitted loan applications to defendant, and defendant funded the loans.  (Pl.'s App'x, Ex. D at

20, 27-29.)  Defendant was not under contract or obligation to purchase Coastal loans.  (Def.'s

S.F. ¶¶ 27-28.)  Thomas Hogan, a department manager of defendant who set up the business

arrangement with Coastal, indicated that defendant turned down loan applications from Coastal,

but he could not indicate how many of Coastal's loan applications were rejected.  (Pl.'s App'x,

Ex. E at 14-15.)  The agreement between the parties provided: "Status of Seller.  Nothing in this

Agreement shall be construed as making [Coastal] a joint venture, partner, representative,

employee or agent of [defendant] . . . ."  (Def.'s S.F. ¶ 23; Def.'s App'x, Ex. H at 4.)

Defendant and Coastal shared an "operating account," which was a checking account into

which defendant could deposit funds and from which Coastal could withdraw funds.  (Pl.'s

App'x, Ex. E at 18.)  Coastal disbursed the funds from the operating account to the borrower's

creditors.  (Id. at 100; Pl.'s App'x, Ex. E at 14-15.)  Coastal received remuneration for obtaining

the loan and preparing loan documentation.  (Pl.'s App'x, Ex. F at 9.)  The payment came from a reserve fund set up by defendant.  (Id.)

Defendant first started having trouble with Coastal in the early 2000s.  (Pl.'s App'x, Ex. D at 22.)  Defendant ceased the relationship with Coastal after learning Coastal placed false information on loan applications and that Coastal had assigned fraudulent mobile home loans to Banknorth.  (Id. at 40-41; Def.'s S.F. ¶ 30.)  The relationship ended in September 2002.  (Pl.'s App'x, Ex. E at 9.)  Catherine Morton, manager of defendant's collection department, was contacted by a borrower who explained that the borrower signed a loan application from Coastal, but the loan was not for the purpose of purchasing a mobile home.  (Pl.'s App'x, Ex. D at 23-24.)  The loan application, however, reflected that the loan was for mobile home purchase.  (Id.)

With respect to Poskins' loan, one or more employees of defendant reviewed and approved that loan in accordance with defendant's policy.  (Pl.'s S.F. ¶ 5.)  Defendant's loan officer handling the review and approval of Poskins' loan did a credit review and debt-to-income ratio analysis of Kenneth Poskin.  (Id.)  The loan officer used the Coastal documentation of Poskins' loan to supply the information necessary to perform the credit review and debt-to-income ratio analysis of Kenneth Poskin.  (Pl.'s App'x, Ex. F at 20-28.)

In performing these tasks, however, it is not clear whether defendant independently verified any information contained in Poskins' loan application.  The application indicated that Kenneth Poskin was employed by Ambridge Steel, and had been so employed for fifteen years, and was making $1,600.01 per month.  (Pl.'s App'x, Ex. D. at 126; Pl.'s App'x, Ex. B.)  His credit report, however, stated he was self-employed and retired.  (Id.; Pl.'s App'x, Ex. F at 36.)  Catherine Morton testified at her deposition that she never made any effort to verify or refute that he was employed by Ambridge Steel.  (Pl.'s App'x, Ex. D. at 132.)  Mark Bouvier, the loan

officer and credit analyst who approved Poskins' loan, testified at his deposition that he needed to verify Kenneth Poskin's income and employment with Ambridge Steel.  (Pl.'s App'x, Ex. F. at 25-26.)  He requested that a W-2 form and pay stub be obtained by Coastal, and submitted to defendant.  (Id. at 26-27.)  Mark Bouvier testified that if the W-2 and pay stub were not submitted, Tom Prowdy could waive the requirement that those documents be produced.  (Id. at 28-29.)  There is no indication in Poskins' loan documents, however, that such a waiver was made.  (Id. at 29.)  In addition, the credit report that was reviewed by defendant as part of the approval process failed to indicate any debt owed to Central Finance.  (Pl.'s App'x, Ex. D. at 124.)

During September and October 2001, defendant paid a total of $29,492.98 to various creditors of Kenneth Poskin's in differing amounts.  (Def.'s S.F. ¶¶ 32-33.)  On October 18, 2001, the balance on Kenneth Poskin's mobile home loan with Hudson United was paid in full.  (Def.'s S.F. ¶ 31; Pl.'s S.F. ¶ 22.)  Defendant used $3,601.50 of the loan proceeds to cover the loan's closing costs.  (Def.'s S.F. ¶ 35.)  Kenneth Poskin's closing statement reflects that he owed $6,020.09 to an entity, Central Finance, which plaintiffs allege is a fictitious company and argue defendant knew or should have known of this wrongful charge.  (Def.'s App'x, Ex. F; Pl.'s S.F. ¶ 11.)

Beginning shortly after September 11, 2001, plaintiffs contacted Coastal several times to inquire about copies of the loan documents and disbursement of the funds.  (Pl.'s S.F. ¶ 21.)  Plaintiffs were not successful in their effort to obtain the relevant loan documents and other information regarding the loan from Coastal.  (Pl.'s S.F. ¶ 22.)  Although Coastal did not provide plaintiffs with the information requested, in November 2001 Banknorth provided Finian Poskin copies of the relevant loan documents, including the loan application, security agreement,

mortgage note, and loan disbursement sheet.  (Def.'s S.F. ¶ 42; Pl.'s S.F. ¶ 22.)  From the loan

documents that defendant produced, plaintiffs learned for the first time that Coastal assigned the

loan to defendant, that the actual loan amount was $39,050.83, and that their interest rate was

10.396%.  (Def.'s S.F. ¶ 42; Pl.'s S.F. ¶ 23.)  The actual loan amount of $39,050.83 is several

thousand dollars more than plaintiffs believed they had agreed to borrow or were qualified to

borrow.  (Pl.'s S.F. ¶ 23.)

 In January 2002, Poskins met with an attorney who wrote a letter to Banknorth on behalf

of Poskins raising concerns about Banknorth's misleading business practices.  (Def.'s S.F. ¶ 43;

Def.'s App'x, Ex. M.)  Poskins could not afford the attorney's services, and he did not make any

other representations on behalf of them after the January 2002 letter.  (Pl.'s App'x, Ex. C at 86-

89.)  Despite plaintiffs' concerns with the mortgage loan, plaintiffs made payments to Banknorth

until August 2002.  (Def.'s S.F. ¶ 44.)

 After receiving copies of the relevant loan documents from defendant, plaintiffs indicated

that some of Kenneth Poskin's signatures had been forged.  (Def.'s S.F. ¶ 45.)  Defendant would

send an affidavit of forgery to any borrower who indicated that his or her signature was forged

on a loan document.  (Pl.'s App'x, Ex. D at 56.)  Defendant's general policy was that if a

borrower was subject to a fraudulent loan and the borrower filed the appropriate affidavits of

forgery with the bank, the borrower would not be forced to repay the loan.  (Pl.'s App'x, Ex. E at

29.)

 On October 22, 2002, Kenneth Poskin submitted an affidavit of forgery to defendant.

(Pl.'s App'x, Ex. B.)  He indicated that his signature on the loan application was forged.  (Id.)

On December 10, 2002, Catherine Morton spoke to Finian Poskin.  (Pl.'s App'x, Ex. D at 56.)

Finian Poskin inquired whether defendant received the affidavit of forgery completed by

Kenneth Poskin.  (Id. at 57.)  On December 11, 2002, Catherine Morton indicated that she received the affidavit of forgery and would review it the following morning.  (Id. at 67-68.)

Sometime after the December 10, 2002 conversation with Finian Poskin, Catherine Morton prepared a memorandum to her supervisor, Joe McDonald.  (Id. at 105-06.)  The memorandum indicated that the borrower was on disability when the loan originated, and it stated Kenneth Poskin "signed a forgery affidavit indicating that the documents do have his signature, however he did not put down that he had been employed with Ambridge Steel for 15 years."  (Id. at 109-12.)  Catherine Morton interpreted this as meaning that he signed the loan documents, but that he did not realize he was acknowledging false information.  (Id. at 112.)

Although plaintiffs alleged that the loan provided for a sum of approximately $6,000 to be paid to Central Finance, a fictitious company allegedly used by Coastal to launder money, Catherine Morton was never alerted by defendant about problems with loans to Central Finance, and Banknorth continued to collect on loans made to this entity.  (Pl.'s App'x, Ex. D at 79-80.)  Catherine Morton was never alerted about any problems with loans that were for a greater amount of money than what the borrower agreed to borrow.  (Id. at 80.)

Catherine Morton learned that Linda Ambrose, a notary used by Coastal, improperly notarized the documents of several borrowers.  (Id. at 75-76.)  Catherine Morton learned this from the settlement of a case between Coastal and defendant.  (Id.)  Catherine Morton was notified of the settlement by defendant's legal department.  (Id. at 77.)  The settlement agreement was executed in September 2002.  (Id. at 97-98.)

On December 13, 2002, Finian Poskin called Catherine Morton.  (Id. at 70-71.)  Finian Poskin told Catherine Morton that she did not sign any documents, and that Kenneth Poskin's signature was not properly notarized.  (Id. at 74-75.)  Finian Poskin believed that the notary

indicated that the mortgage was signed in Lehigh County, Pennsylvania, but plaintiffs maintained that all documentation was signed in Washington County, Pennsylvania.  (Id.; Pl.'s App'x, Ex. B.)  On January 3, 2003, Catherine Morton again spoke with Finian Poskin.  (Pl.'s App'x, Ex. D at 77-78.)  Catherine Morton advised Finian Poskin that defendant merely purchased the loan from Coastal.  (Id. at 78.)  Catherine Morton did not have any knowledge, however, of the agreement between Coastal and defendant.  (Id.)

At some subsequent time, Michelle Jenson, who worked in defendant's collections department, indicated that Poskins' signatures were to be reviewed because plaintiffs alleged that they did not sign for the amount of money that the loan documents indicated they borrowed.  (Id. at 81-82.)  Michelle Jenson noted: "Explain again that the issue is with the closing company, we bought the loan from them. . . . Explain to her that the disbursement sheet shows what was paid." (Id. at 82.)  The disbursement sheet indicated that all disbursements were received by the various entities, including Central Finance; Catherine Morton believed Central Finance received its disbursement.  (Id. at 84-85.)  On March 5, 2003, Michelle Jenson submitted a foreclosure recommendation sheet to defendant's committee responsible for reviewing those recommendations.  (Id. at 91.)  The recommendation indicated that Poskins claimed parts of the loans were fraudulent, and that it was a Coastal loan.  (Id. at 95-96.)  Even though Catherine Morton indicated she would be the appropriate person to ask whether such a claim was investigated, she could not recall whether the committee reviewed Poskins' claim.  (Id. at 95-96.) Defendant's collections department had access to the entire Poskins' file.  (Pl.'s App'x, Ex. D at 48-49.)

As a result of Poskins' financial problem with Coastal and various other creditors, Kenneth Poskin became depressed beginning in October 2001 and went into a catatonic state for

almost a year.  (Def.'s S.F. ¶¶ 52-53.)  In January 2003, Kenneth Poskin set his mobile home on fire in an attempt to commit suicide.  (Def.'s S.F. ¶¶ 50-51; Def.'s App'x, Ex. B at 34-36.)  In response to the arson incident, the state hospitalized and incarcerated Kenneth Poskin for the better part of a year.  (Def.'s S.F. ¶ 51; Def.'s App'x, Ex. B at 34-36.)

In February 2003, Banknorth sent Kenneth Poskin a letter offering a loan modification to reduce his interest rate and defer his late payments.  (Def.'s S.F. ¶ 54.)  This letter also indicated that further delinquency would result in repossession of the collateral for the loan.  (Def.'s S.F. ¶ 55.)  The modification, however, made no adjustment for the alleged fraudulent disbursements. (Def.'s S.F. ¶ 54 (Plaintiff's Response).)  Kenneth Poskin did not enter into the loan modification agreement because he did not believe that Banknorth had the right to collect on a loan for which the underlying loan documents were falsified.  (Id.)  In May 2003, plaintiffs learned about criminal prosecutions of various Coastal representatives and employees for falsifying information pertaining to the creditworthiness of Kenneth Poskin.  (See Def.'s S.F. ¶ 56; Pl.'s S.F. ¶¶ 12, 40-45; Def.'s App'x, Ex. S.)

Plaintiffs retained their present counsel in February 2003.  (Pl.'s S.F. ¶ 31.)  In September 2003, Banknorth filed a foreclosure action against Poskins.[3]  (Def.'s S.F. ¶ 63.)  On December 10, 2003, Banknorth filed a subsequent action in replevin against plaintiffs.[4]  (Def.'s S.F. ¶ 64.) On February 23 and March 5, 2004, plaintiffs filed objections to the respective repelvin and foreclosure actions.[5]  (Id.)  Banknorth subsequently filed two amended complaints, and plaintiffs objected to them.  (Pl.'s S.F. ¶¶ 32-35.)  Without curing the alleged defects in the complaint,

---

[3] Docket No. 2003-5457, Court of Common Pleas of Washington County, Pennsylvania.

[4] Docket No. 2003-7170, Court of Common Pleas of Washington County, Pennsylvania.

[5] Plaintiffs objected to notice, the joining of Finian Poskin, and Banknorth's failure to include record of the assignment from Coastal.  (Pl.'s S.F. ¶ 31.)

Banknorth filed a praecipe for judgment for failure to answer on the foreclosure action in August 2004 and a writ of execution in December 2004.  (Pl.'s S.F. ¶ 37.)  The court denied both motions. (Id.)  Banknorth initiated no further action, but on February 23, 2005, plaintiffs filed a request for production of documents.  (Pl.'s S.F. ¶ 38.) Without producing any documents, Banknorth filed praecipes to discontinue both actions without prejudice on June 28, 2005.  (Id.)

Defendant maintains that it withdrew the actions against plaintiffs because proceeding would not have been cost-effective for Banknorth.[6]  (Def.'s S.F. ¶ 67.)  Plaintiffs argue that Banknorth never intended to proceed to discovery and that defendant tried to coerce a settlement by initiating the foreclosure and replevin actions against plaintiffs.  (See Plaintiffs' Third Amended Complaint (Doc. No. 24).)  Plaintiffs also allege that Banknorth sued Finian Poskin in an attempt to attach jointly-held real estate.[7]  On April 7, 2006, plaintiffs filed the present action against Banknorth.  (See Complaint (Doc. No. 1).)

### Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).

---

[6] According to Banknorth's cost-benefit analysis, the value of the collateral would have been less than the cost of securing a judgment against plaintiffs.  (Def.'s S.F. ¶ 67.)

[7] The jointly-held real estate is the 5.9-acre Deemston property.  There is a deed transferring property from Kenneth Poskin and Finian Poskin to Kenneth Poskin individually, but plaintiffs maintain that the real estate is jointly held and that someone forged Finian Poskin's signature on the deed.  (Def.'s App'x, Ex. G.)

The nonmoving party must point to specific affirmative evidence in the record, rather than rely upon conclusory or vague allegations or statements.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Concrete evidence must be provided for each element of each of the claims, and the evidence must be such that a reasonable fact-finder could find in that party's favor at trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  "A nonmoving party, like plaintiff, must 'designate specific facts showing that there is a genuine issue for trial.'"  Orenge v. Veneman, No. 04-297, 2006 WL 2711651, at *6 (W.D. Pa. Sept. 20, 2006) (citing Celotex, 477 U.S. at 324).

A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact.  Anderson, 477 U.S. at 248.  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  Id. at 249.  The court may consider any evidence that would be admissible at trial in deciding the merits of a motion for summary judgment.  Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993); Pollack v. City of Newark, 147 F. Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1957) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").

### Discussion

Defendant moved for summary judgment with respect to each of plaintiffs' seven counts against it, and also moved for summary judgment on its unjust enrichment counterclaim.  Defendant argues that summary judgment should be granted because several of plaintiffs' claims

are time barred; Banknorth is not a credit repair organization; the National Bank Act, 12 U.S.C. §§ 21 et seq. ("NBA"), preempts several of plaintiffs' state law claims; Finian Poskin does not have standing; plaintiffs have not established a prima facie case of malicious prosecution; there is no agency relationship between Coastal and Banknorth; and plaintiffs have been unjustly enriched.  In response, plaintiffs argue that equitable doctrines apply to toll the applicable statute of limitations periods; Banknorth does not have to be a credit repair organization to be liable under the Truth in Lending Act, 15 U.S.C. §§ 1601 et seq. ("TILA"); the NBA does not preempt plaintiffs' state law claims; Finian Poskin suffered a legal injury; the evidence supports the malicious prosecution claim; the evidence supports the finding of an agency relationship between Coastal and Banknorth; and defendant is not entitled to summary judgment on its unjust enrichment claim.  The facts and law relevant to these arguments are described in more detail below.

## I.  Count I

Count I of plaintiffs' third amended complaint asserts claims for violations of three sections of the TILA that are part of the Credit Repair Organizations Act, 15 U.S.C. §§ 1679 et seq. ("CROA").  Plaintiffs' claims are based upon §§ 1679b(a)(1)(B)(ii), 1679b(a)(2)(B)(ii), and 1679b(a)(4) of the CROA.  Section 1679b(a)(1)(B)(ii) prohibits any person from making an untrue or misleading statement to any person to whom the consumer has applied for an extension of credit:

> No person may make any statement, or counsel or advise any consumer to make any statement, which is untrue or misleading (or which, upon the exercise of reasonable care, should be known by the credit repair organization, officer, employee, agent, or other person to be untrue or misleading) with respect to any consumer's credit worthiness, credit standing, or credit capacity to any person to whom the consumer has applied or is applying for an extension of credit.

15 U.S.C. § 1679b(a)(1)(B)(ii).  Section 1679b(a)(2)(B)(ii) prohibits any person from making a statement intended to alter the consumer's identification in order to prevent the display of adverse credit information to any person to whom the consumer has applied or is applying for an extension of credit:

> No person may make any statement, or counsel or advise any consumer to make any statement, the intended effect of which is to alter the consumer's identification to prevent the display of the consumer's credit record, history, or rating for the purpose of concealing adverse information that is accurate and not obsolete to any person to whom the consumer has applied or is applying for an extension of credit.

15 U.S.C. § 1679b(a)(2)(B)(ii).  Section 1679b(a)(4) prohibits any person from engaging, directly or indirectly, in any act or course of business that constitutes or results in fraud or deception against any person in connection with the offer or sale of the services of the credit repair organization:

> No person may engage, directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization.

15 U.S.C. § 1679b(a)(4).  Plaintiffs allege that acting jointly or in concert with Coastal, defendant misrepresented Kenneth Poskin's salary on the loan application and intended to alter his identification for the purpose of concealing adverse credit information.  Plaintiffs further allege that defendant accepted, approved, ratified, and benefitted from the misrepresentation of Kenneth Poskin's salary.  Defendant raises three defenses to count I: (A) defendant is not a credit repair organization, (B) Finian Poskin does not have standing to sue with respect to count I, and (C) the actions of Coastal cannot be attributed to defendant.

**A. Whether count I of plaintiffs' complaint fails as a matter of law because defendant is not a credit repair organization.**

14

First, defendant argues that because it is not a credit repair organization, plaintiffs' claims under § 1679b fail as a matter of law.  According to § 1679a of the CROA, the term "credit repair organization" is defined as

> any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of: (i) improving any consumer's credit record, credit history, or credit rating; or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i) . . . .

15 U.S.C. § 1679a(3)(A).  The term "credit repair organization" does not include "(iii) any depository institution (as that term is defined in section 1813 of Title 12) or any Federal or State credit union (as those terms are defined in section 1752 of Title 12), or any affiliate or subsidiary of such a depository institution or credit union."  15 U.S.C. § 1679a(3)(B).  Defendant, as a depository institution, falls within the exclusion and is not a credit repair organization.

Even assuming defendant is correct in arguing it is not a credit repair organization, summary judgment may not be granted with respect to count I solely on the basis that defendant is not such an organization.  In Vance v. National Benefit Ass'n, No. 99 C 2627, 1999 WL 731764, at **3-4 (N.D. Ill. Aug. 30, 1999), the defendant bank moved for dismissal of a complaint alleging that the bank violated the CROA on the ground that it was not a credit repair organization.  The court in that case recognized that the CROA specifically excludes banks from the definition of credit repair organizations, but noted that certain CROA prohibitions nevertheless apply to "any person," regardless whether that person falls within the definition of a credit repair organization.  The court held that the defendant bank was a "person" for purposes of liability under the statute.  Id.

When Congress uses different terms in the same statute and in the absence of contrary evidence, the terms have different meanings.  See 2A NORMAN J. SINGER & J.D. SHEMBIE

SINGER, SUTHERLAND ON STATUTES AND STATUTORY CONSTRUCTION § 46:6, at 252 (7th ed. 2007) ("The use of different terms within related statutes generally implies that different meanings were intended"); In re Wright, No. 05-40829-JJR-13, 2007 WL 1459475, at *6 (N.D. Ala. May 16, 2007).  The prohibitions of § 1696b apply to "any person."  As used in the CROA, the legal use of the term "person" encompasses a broader range of individuals and entities than the term "credit repair organization."  In re Wright, 2007 WL 1459475, at *6.

Congress uses both the terms "person" and "credit repair organization" in § 1679b, indicating that the terms are not to be interchangeably read.   Defendant does not identify any legislative history or intent indicating that an entity such as Banknorth cannot be liable as a "person" under § 1679b, and defendant does not argue that artificial entities are not persons. Accordingly, count I does not fail as a matter of law even though defendant is not a credit repair organization under § 1679a(3).

### B. Whether the court should dismiss the claims of plaintiff Finian Poskin because she lacks standing to sue in count I.

Defendant alleges that Finian Poskin does not have standing to sue because she is not a party to the loan transaction.  A loan transaction is a contract between the borrower and the lender.  Weiner v. Bank of King of Prussia, 358 F. Supp. 684, 690-91 (E.D. Pa. 1973).  A person who is not a party to a contract does not have standing to assert rights under the contract.  See Evans v. Union Mortgage Co., 114 B.R. 434, 437 (Bankr. E.D. Pa. 1990) (refusing to recognize standing under the TILA for borrower's daughter who signed, on behalf of her father, her father's name on the loan documents).

The court must first look to the language of the CROA to analyze questions implicating the act.  Because the CROA is a consumer protection statute with a remedial purpose, the court should broadly interpret it.  See Helms v. Consumerinfo.com, Inc., 436 F. Supp. 2d 1220, 1229

16

(N.D. Ala. 2005).  The court, however, will not construe the language of the CROA more broadly than what is meant by the plain language of the statute.  Id.

Section 1679g provides: "Any person who fails to comply with any provision of this subchapter with respect to any other person shall be liable to such person . . . ."  15 U.S.C. § 1679g.  The plain language of §§ 1679b(a)(1)(B)(ii) and 1679b(a)(2)(B)(ii) refers to wrongs against the consumer; these sections make no mention of violations against any person except the consumer.  15 U.S.C. § 1679b.  The language of the statute indicates Congress intended that only consumers may pursue claims under those provisions of § 1679b.  See Id.

Section 1679b(a)(4), unlike §§ 1679b(a)(1) and 1679b(a)(2), prohibits a person from committing fraud against "any person in connection with the sale of services or goods."  Given the reasoning above, the phrase "any person in connection with the offer or sale of services" is more expansive than the term "consumer."  Congress' reference to "any person in connection with the offer or sale of services" indicates that persons not a party to the loan transaction (persons who are not the consumer) could nevertheless be a person "in connection with the offer or sale of services."

Here, Finian Poskin was not a consumer because she was not party to the loan transaction.  Her signature is nowhere on the loan documents, and she is never referred to as a co-borrower.  A borrower's wife, who is not a legal party to the loan transaction and who signed nothing, does not have standing to sue under § 1679b(a)(1)(B)(ii) or § 1679b(a)(2)(B)(ii) as a consumer.[8]

_____

[8] The facts of Evans are distinguishable from the present case in that Finian Poskin, unlike the daughter in Evans, did not sign the loan documents at all.  The relevant point in Evans is the holding of the court that a person who actually signed the documents, on behalf of the borrower, did not have standing.  Evans, 114 B.R. at 437.  In other words, where an agent for the borrower

Finian Poskin, however, made all payments on the loan from a joint bank account maintained by Poskins.  Finian Poskin responded to the initial solicitation from Coastal and was the primary contact with Coastal up to the date of the loan execution.  Given Finian Poskin's involvement in Kenneth Poskin's financial matters from 2001 to 2004, she is a person in connection with the offer or sale of services.  Accordingly, Finian Poskin, while she does not have standing to sue as a consumer for violations of § 1679b(a)(1)(B)(ii) or § 1679b(a)(2)(B)(ii), does have standing to sue under § 1679b(a)(4).

### C.  Whether an agency relationship exists between Banknorth, Coastal, or individual defendants.

Defendant's final argument in support of summary judgment with respect to count I is that there was no agency relationship between Coastal and Banknorth.  "The basic elements of agency are 'the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.'"  Scott v. Purcell, 415 A.2d 56, 60 (Pa. 1980) (quoting Restatement (Second) of Agency § 1, cmt. b (1958) and citing Chalupiak v. Stahlman, 81 A.2d 577, 580 (Pa. 1951)).

> "[T]he liability of a principal to third parties for the act of an agent must rest on (1) express authority, or that which is directly granted; (2) implied authority, to do all that is proper, usual and necessary to the exercise of the authority actually granted; (3) apparent authority, as where the principal holds one out as agent by words or conduct, and (4) agency by estoppel."

Bensalem Twp. v. Coregis Indem. Co., No. 91-5315, 1995 WL 290438, at *9 (E.D. Pa. May 10, 1995) (quoting Apex Financial Corp. v. Decker, 369 A.2d 483, 485 (Pa. Super. Ct. 1976)).

Authority is defined as "the power of the agent to affect the legal relations of the principal by

---

does not have standing, Finian Poskin, who was neither a borrower nor an agent for the borrower, would not have standing to sue.

acts done in accordance with the principal's manifestations of consent to him." RESTATEMENT

(SECOND) OF AGENCY § 7 (1958).

"The burden of establishing agency rests upon the party asserting it." Scott, 415 A.2d at

61 n.8 (citing Girard Trust Bank v. Sweeny, 231 A.2d 407 (Pa. 1967)). Plaintiffs do not,

however, have "to furnish direct evidence of the specific authority if it can be reasonably inferred

from the circumstances of the case, such as the relation of the parties to each other and their

conduct with reference to the subject matter of the contract, that there was at least an implied

intention to create" an agency relationship. Id. (internal citations omitted). The theory of agency

advanced by plaintiffs is one of implied authority.

Authority may be "implied or inferred from the words used, from customs and from the

relations of the parties." RESTATEMENT (SECOND) OF AGENCY § 7, cmt. c (1958). Implied

authority "has been variously defined. It has been held to be actual authority given implicitly by

a principal to his agent." Lind v. Schenley Indus., Inc., 278 F.2d 79, 84-85 (3d Cir. 1960). It has

also been defined as the "authority to bind the principal to those acts of the agent that are

necessary, proper and usual in the exercise of the agent's express authority." CGB Occupational

Therapy, Inc. v. RHA Health Servs. Inc., 357 F.3d 375, 386 (3d Cir. 2004) (quoting Bolus v.

United Penn Bank, 525 A.2d 1215, 1221 (Pa. Super. Ct. 1987)). "Implied authority is found

when the facts indicate the principal's intent to confer agency authority." Khurana v. Strategic

Distribution, Inc., No. 07-5188, 2008 WL 5191816, at *3 (E.D. Pa. Dec. 10, 2008) (citing 4

CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1097 (3d

ed.1987)).

> The fact that the third person with whom the agent deals on account of the
> principal has no knowledge of the manifestations of the principal, or even of the
> principal's existence, does not prevent the agent from having authority to make
> the principal a party to the transaction in accordance with his instructions.

RESTATEMENT (SECOND) OF AGENCY § 7, cmt. d (1958).  The issue whether an agency

relationship exists is decided from the facts of each case.  Exact Precision, Inc. v. Accura Zeisel

Machinery Corp, No. 98-4168, 1999 WL 1197899, at **2-3 (E.D. Pa. 1999).  Given the factual

nature of the agency inquiry, the existence of an agency relationship is generally a question that

should be decided by a jury.  Id.

       "In the broker-lender context, if the evidence indicates that 'the broker had a close

relationship or far more authority than that of simply bringing the borrower and lender together,'

then the Court 'may deem the broker to be an agent of the lender.'"  Whitley v. Taylor Bean &

Whitacker Mortgage Corp., 607 F. Supp. 2d 885, 895 (N.D. Ill. 2009) (quoting Taylor, Bean &

Whitaker Mortgage Corp. v. Cebulak, No. 03 C 7425, 2004 WL 2106605, at *12 (N.D. Ill. Sept.

20, 2004)); see also RESTATEMENT (SECOND) OF AGENCY § 14L cmt. c (1958) (explaining "[a]

person who conducts a transaction between two others may be an agent of both of them in the

transaction," and "[t]he situations which call for the application of the rule . . . are varied and the

facts of each must be examined to determine to which of two parties the agent owes the duty of

loyalty, which is the ultimate fact to be decided. *A statement in the contract of the parties that he

is the agent of one of them is not conclusive . . .*, nor is the fact that he receives his compensation

from one of them." (emphasis added)).

        Express disclaimers of agency do not necessarily negate the existence of the
        agency relationship.  See First Liberty Investment Group v. Nicolsberg, 145 F.3d
        647, 652 (3d Cir. 1998) ("[N]otwithstanding the Agreement's . . . disclaimer of an
        'agent' relationship, [defendant] was an 'associated person' as to [plaintiff]");
        Carr v. Stillwaters Dev. Co., L.P., 83 F. Supp. 2d 1269, 1279 (M.D. Ala.1999); In
        re Parmalat Secs. Litig., 377 F. Supp. 2d 390, 404 (S.D.N.Y. 2005) (stating that
        "written disclaimers of agency are not controlling, but merely raise an issue of
        fact with respect to an alleged agent's authority"); RESTATEMENT (SECOND) OF
        AGENCY § 1 cmt. b ("*The relation which the law calls agency does not depend on
        the intent of parties to create it, nor their belief that they have done so*")  If courts
        routinely recognized disclaimers of agency, parties could conduct themselves as

> principal and agent without the legal ramifications that accompany that special relationship. <u>See</u> <u>Carr</u>, 83 F. Supp. 2d at 1279.  The key to determining the agency relationship is the principal's consent to the agent acting on its behalf and the principal's control of the agent.  <u>See</u> RESTATEMENT (SECOND) OF AGENCY § 1.

<u>Am. Home. Mortgage Corp. v. First Am. Title Ins. Co.</u>, No. 07-01257, 2007 WL 3349320, at *5 (D.N.J. Nov. 9, 2007) (emphasis added).

In <u>Whitley</u>, the plaintiffs, first-time home buyers, purchased a home they could not afford.  <u>Whitley</u>, 607 F. Supp. 2d at 891.  They sued the real estate broker, mortgage broker, and lender.  They alleged that the defendants "knew or should have known that [the plaintiffs] could not afford to make the payments" and the defendants "fraudulently or negligently represented to [the plaintiffs] that they could afford the home."  <u>Id.</u> at 892. The plaintiffs alleged that the defendants used an inflated home value and false employment and educational information that resulted in increased commissions, fees, and interest rates.  <u>Id.</u>  The lender filed a motion to dismiss on the basis that the plaintiffs did not plead sufficient facts to support an agency relationship; the court denied the motion on this basis.  <u>Id.</u> at 896.  In support of its allegation that the mortgage broker was an agent of the lender, the plaintiffs asserted that the mortgage broker arranged a significant number of loans for the lender, the mortgage broker and real estate broker received kickbacks from the lender for obtaining a high interest rate on the loan, and the mortgage broker utilized the lender's credit granting policies, rate sheets, product sheets, loan pricing software, closing documents and training materials to process the loan.  <u>Id.</u> at 895-96.

In <u>Mills v. Equicredit Corp.</u>, 344 F. Supp. 2d 1071, 1078 (E.D. Mich. 2004), the plaintiffs sued First Discount Mortgage and Equicredit for common law fraud and misrepresentation.  First Discount Mortgage was the mortgage broker, and Equicredit was the lender.  <u>Id.</u> at 1073.  The plaintiffs never communicated with Equicredit prior to closing the relevant transactions, but alleged that First Discount Mortgage and Equicredit had an agency relationship, and First

Discount Mortgage's misrepresentations should be attributed to Equicredit.  Id. at 1078.  The

court explained that:

> First Discount and EquiCredit's agreement which set forth the requirements for
> First Discount's submission of a loan application expressly stated that First
> Discount was not an agent of EquiCredit.  Plaintiffs have testified that they had no
> reason to believe that First Discount was an agent of EquiCredit.  Plaintiffs were
> never told that First Discount was EquiCredit's agent.  Plaintiffs also signed a
> Mortgage Broker/Borrower Agreement which stated that First Discount would act
> as their agent in obtaining a lender.

Id. at 1078 (internal citations omitted).  The court concluded that the plaintiffs did not bring forth

sufficient evidence to support their claim of an agency relationship, and the court granted

summary judgment in favor of Equicredit.  Id.

In Hawthorne v. American Mortgage, Inc., 489 F. Supp. 2d 480, 481 (E.D. Pa. 2007), the

plaintiffs sued American Mortgage, their mortgage broker, and Countrywide, the mortgage

lender.  Countrywide moved for summary judgment, arguing that the plaintiffs did not

communicate with it during the loan application process, and did the plaintiffs enter into a

contract with it.  The plaintiffs argued that American Mortgage's breach of contract and

misrepresentations were attributable to Countrywide, pursuant to an agency theory.  The

plaintiffs relied upon four facts to establish an agency relationship: (1) Countrywide provided

American Mortgage access to its internal proprietary software, (2) Countrywide left all

communications to be made with borrowers with American Mortgage and other brokers, (3)

American Mortgage was a correspondent bank that could close mortgages itself and

subsequently place those loans with Countrywide, and (4) Countrywide on occasion referred to

American Mortgage as its "partner."  Id. at 484.  The court granted Countrywide's motion for

summary judgment, stating "[t]hese four pieces of evidence, when scrutinized singly or jointly,

do not add up to an agency relationship."  Id. at 484-85.  With respect to the third piece of

evidence, the court explained that a correspondent bank has "the financial wherewithal to be able to fund [its] own loans," and that "American Mortgage's status as a correspondent bank shows that it was independent from Countrywide – not controlled by it – and thus was not its agent." Id. at 485.

In Garczynski v. Countrywide Home Loans, Inc., No. 08-5128, 2009 WL 2476622, at *4 (E.D. Pa. Aug. 12, 2009),  the plaintiffs sued Countrywide under Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. §§ 201-1 et seq. ("UTPCPL"). Countrywide loaned money to the plaintiffs secured by the plaintiffs' "dream house."  Id. at *1. The plaintiffs alleged that Choing, an employee of the mortgage broker Hanson Mortgage Group, engaged in deceptive conduct.  Id. at **4-5.  The plaintiffs further alleged that Choing was an agent of Countrywide, and Choing's conduct was attributable to Countrywide.  The court granted a motion to dismiss, noting:

> Plaintiffs have not alleged that Countrywide exerted any control over either Choing or Hanson Mortgage Group. Plaintiffs' Amended Complaint states that Choing presented Plaintiffs' loan application to several prospective lenders, including Countrywide, before Countrywide approved Plaintiffs' loan.

Id. at *5.  The court relied heavily upon another decision of the United States District Court for the Eastern District of Pennsylvania, Morilus v. Countrywide Home Loans, Inc., No. 07-900, 2008 WL 5377627 (E.D. Pa. Dec. 22, 2008).  In Morilus, the court stated that "[w]hile control is a key factor in determining whether an agency was intended, it must be of such a high degree that the purported agent is deemed to have had almost no independence."  Morilus, 2008 WL 5377627, at *6.  In Morilus the court explained that the lender in the case merely "was dictating the base requirements for any business transactions.  Assuming that [the brokers] were fully compliant, the fact that they may have adhered to those standards does not necessarily indicate

that [the lender] 'controlled' them." Id.  The district court especially noted that the broker was an independent broker, who could send a deal to any one of over one-hundred lenders.  Id. at *7.

In Palmer v. Wells Fargo Bank, N.A., No. 06-4504, 2008 WL 141752, at *1 (E.D. Pa. Jan. 10, 2008), the plaintiff sought to obtain a home improvement loan.  Her broker, Ganz of Bryn Mawr Mortgage Group, procured a loan underwritten by Wells Fargo Bank.  The plaintiff, among other claims, asserted that Wells Fargo Bank violated the TILA by failing to factor in a premium for hazard insurance in its calculation of the loan finance charge.  Id. at *2.  With respect to this claim, the plaintiff alleged that Ganz obtained the insurance without her knowledge and was an agent of Wells Fargo Bank.  The court held that the plaintiff adduced sufficient evidence upon which a reasonable fact-finder could conclude that Ganz acted as Wells Fargo Bank's agent in obtaining hazard insurance, despite an express waiver of an agency relationship in the broker agreement between Bryn Mawr Mortgage Group and Wells Fargo Bank.  Id.  A key fact to the court was Ganz's testimony that an executive at Wells Fargo Bank instructed him how to prepare the plaintiff's loan application in order to ensure the application would be approved.  Id.  The court distinguished Hawthorne, arguing that evidence of the use of the lender's software in that case only established a generic working arrangement.  Id.

Here, although a close call, the court concludes that plaintiffs presented sufficient evidence that gives rise to a genuine issue of material fact regarding the existence of an agency relationship.  This situation is closer to that in Palmer than those in Hawthorne, Garcyznski, or Morilus.  Like the agreement in Palmer, the working arrangement between Coastal and defendant may have been more than a generic working arrangement.  The existence of a joint account over which Coastal had control along with defendant and Coastal being defendant's sole broker for mobile home loans over a four-year period implicate that the arrangement here was

24

more akin to an agency relationship than an arms-length transaction.  On the other hand, the

assignment agreement between Coastal and defendant disclaimed an agency relationship and

there is no evidence that defendant knew about Coastal's employees forging and falsifying

documents until later in time when defendant terminated the relationship.  Coastal's ability to

disburse funds from the operating account directly to the creditors of borrowers may be found to

be an indication of authority to act on behalf of Banknorth.  Defendant's apparent failure to

verify the information contained in the Poskins' application – in particular, Kenneth Poskins'

employment – also raises issues.  Construing the evidence in plaintiffs' favor, a reasonable jury

may find, notwithstanding the assignment agreement disclaimer's stated intent to preclude

forming an agency relationship, that Banknorth intended to create an agency relationship with

Coastal.

Viewing the undisputed and disputed facts in the light most favorable to plaintiffs, the

nonmoving parties, the court concludes that a reasonable jury could render a verdict in plaintiffs'

favor on this issue.  A jury will need to determine whether an agency relationship existed

between Coastal and Banknorth.  Under these circumstances, summary judgment cannot be

granted in favor of defendant with respect to count I.


**II.  <u>Count II</u>**

Count II of plaintiffs' complaint alleges violations of several sections of the TILA,

specifically §§ 1639(a), 1639(b), and 1639(h).  Congress designed the TILA to protect

consumers in credit transactions by requiring clear disclosure of relevant terms and costs of the

lending arrangement.  <u>See</u> 15 U.S.C. § 1601, <u>et seq.</u>  Section 1639(a)(1) lists the specific

disclosures that a creditor must make in connection with any mortgage.[9]  Section 1639(a)(2)

addresses disclosures that a creditor must make regarding annual interest rates.[10]  Plaintiffs allege

a violation § 1639(b), which governs the time of disclosure.[11]  Plaintiffs allege that defendant

violated the three-day time period during which the defendant had to make the § 1639(a)(1)

disclosures.  Plaintiffs also allege a violation of § 1639(h), which is a prohibition on extending

credit without regard to payment ability of consumer.[12]  Specifically, plaintiffs allege that

Banknorth, acting jointly, in concert with, or through its agent Coastal, did not make the specific

disclosures within the mandated period and extended credit to Kenneth Poskin without regard to

his true repayment ability.  Defendant moved for summary judgment with respect to count II,

raising three arguments: (A) the statute of limitations bars plaintiffs' TILA claims, (B) Finian

Poskin does not have standing to sue with respect to count II, and (C) the actions of Coastal

---

[9] The two disclosures that a creditor must make are expressed verbatim in § 1639(a)(1)(A) and § 1639(a)(1)(B). Section 1639(a)(1)(A) reads: "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application."  Section 1639(a)(1)(B) reads: "If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan."

[10] Section 1639(a)(2)(A) provides in relevant part, "in the case of a credit transaction with a fixed rate of interest, [disclosure is required of] the annual percentage rate and the amount of the regular monthly payment," and § 1639(a)(2)(B) provides that "in the case of any other credit transaction, [disclosure is required of] the annual percentage rate of the loan, the amount of the regular monthly payment, a statement that the interest rate and monthly payment may increase, and the amount of the maximum monthly payment, based on the maximum interest rate allowed pursuant to section 3806 of Title 12."

[11] Section 1639(b)(1) provides in relevant part that "[t]he disclosures required by this section shall be given not less than 3 business days prior to consummation of the transaction."

[12] Section 1639(h) provides in relevant part that "[a] creditor shall not engage in a pattern or practice of extending credit to consumers under mortgages referred to in section 1602(aa) of this title based on the consumers' collateral without regard to the consumers' repayment ability, including the consumers' current and expected income, current obligations, and employment."

cannot be attributed to defendant.  The court finds that the statute of limitations bars plaintiffs'

claim at count II, and therefore will not need to address defendant's other arguments.

### A.  Whether the applicable statute of limitations bars plaintiffs' TILA claims against defendant.

#### 1.  Federal discovery rule

Defendant argues that the one-year limitations period has run on the § 1639 claims.  The

statute of limitations for the violations set forth in count II is one year: "Any action under this

section may be brought in any United States district court, or in any other court of competent

jurisdiction, within one year from the date of the occurrence of the violation."  15 U.S.C. §

1640(e).

On September 6, 2001, Kenneth Poskin is purported to have executed the loan documents

for the loan that is the subject of this suit.  In moving for summary judgment, defendant argues

that the alleged TILA violations in this case accrued no later than September 6, 2001.  The

lawsuit was commenced on April 7, 2006, well beyond the expiration of the one-year statute of

limitations period.

Plaintiffs in response argue that the limitations period has not yet expired, because, based

upon the federal discovery rule, the claims did not accrue on September 6, 2001.  The federal

discovery rule is used to determine when a federal claim accrues for statute of limitations'

purposes.  Romero v. Allstate Corp., 404 F.3d 212, 222 (3d Cir. 2005).  Under the federal

discovery rule, a claim will accrue when the plaintiff discovers, or with reasonable diligence

should have discovered, the injury that forms the basis for the claim.  Id.  The statute of

limitations begins to run on the date of accrual.

In arguing that their claim did not accrue until a later date based upon discovery rule,

plaintiffs assert that they did not learn about the extent of Banknorth's wrongdoing until the

discovery stage of this case.  This argument, however, is better addressed as an equitable tolling

argument.  See Part II(A)(2).[13]

## 2.  Equitable tolling doctrine of fraudulent concealment

Although plaintiffs invoke the discovery rule, the equitable doctrine of fraudulent

concealment is the relevant doctrine implicated by their argument.  Plaintiffs in essence seek

equitably to toll the limitations period due to fraudulent concealment.  For the equitable tolling

doctrine of fraudulent concealment to apply to a case, a plaintiff must prove that (1) the

defendant actively misled the plaintiff respecting the plaintiff's claim; (2) the defendant

---

[13] Although plaintiffs do not explicitly invoke the discovery rule on the basis of their mental
handicap, that issue needs to be addressed.  The Courts of Appeals for the Third Circuit
considered the issue of mental disability in applying the federal discovery rule.  In Barren by
Barren v. United States, 839 F.2d 987 (3d Cir. 1988), a United States Army veteran and his sister
brought an administrative tort action against the United States, alleging medical malpractice for
providing him with substandard treatment and for failing to admit him to a hospital for in-patient
care.  The veteran suffered from several mental illnesses, including immature personality
disorder, depression neurosis, and anxiety neurosis.  Id. at 988-89.  The court of appeals found
the veteran did not timely commence the action, because the limitations period began to run on
the date a reasonable person would have discovered the alleged malpractice based upon the
information available.  Id. at 990.  The focus is upon "the objective aspects of the test; that is,
the Court was not concerned with whether the plaintiff actually knew of the malpractice, but
whether he possessed the facts such that, as a reasonable person, he should have known of the
malpractice."  Id.  The court of appeals stated: "[a]llowing Barren to file later than an objectively
reasonable person would be tantamount to ruling that a plaintiff's mental infirmity can extend the
statute of limitations.  Such extensions have uniformly been rejected by this and other courts of
appeals."  Id. at 992; see Ebrahimi v. E.F. Hutton & Co., Inc., 852 F.2d 516, 521 (10th Cir. 1988)
("Mental illness, even where rising to the level of insanity, [will not] delay the statute of
limitations from running.").  Under Barren, plaintiffs would need to show a reasonable person
could not have discovered the alleged malpractice earlier then they did.  No such evidence was
presented.  Other courts have found certain mental defects may trigger the discovery rule.  See
Barnhart v. United States, 884 F.2d 295, 298-300 (7th Cir. 1989) (tolling the statute of
limitations when "mental incapacity render[s] plaintiffs incapable of 'discovering' or
understanding the causes of their injuries," such as when the plaintiffs are comatose); Estate of
Henderson ex rel. Johnson v. Meritage Mortgage Corp., 293 F. Supp. 2d 830, 833-35 (N.D. Ill.
2003) (tolling the statute of limitations in the context of a TILA claim when dementia and
Alzheimer's disease prevented the plaintiff from "discovering" the unconscionable and illegal
nature of her mortgage).

prevented the plaintiff from recognizing the validity of the claim within the limitations period; and (3) the plaintiff used reasonable diligence in uncovering the relevant facts that form the basis of a claim.  In re Cmty. Bank of N. Va., 467 F. Supp. 2d 466, 478-79 (W.D. Pa. 2006). The statute of limitations is not a jurisdictional requirement of the TILA, and thus can be tolled. Ramadan v. Chase Manhattan Corp., 156 F.3d 499, 502 (3d Cir.1998).  A court should employ equitable tolling in order to avoid unjust results arising from defendant's fraudulent concealment. Foster v. EquiCredit Corp., No. 99-6393, 2001 WL 177188, at *2 (E.D. Pa. Jan. 26, 2001).

The fraudulent act that forms the basis of a claim for damages under the TILA will not satisfy the factual showing required to invoke the equitable tolling doctrine of fraudulent concealment.  See In re Cmty. Bank of N. Va. 467 F. Supp. 2d at 479.  A plaintiff must show that the lenders "took some active steps to mislead the borrowers with the result the borrowers were lulled into sitting on their right of redress."  Id.  In other words, a plaintiff must point to some additional affirmative fraudulent act that perpetuates concealment; inaction or silence by the lender is not sufficient to show fraudulent concealment to toll equitably the limitations period. Id.

In Foster, the plaintiffs claimed that the defendant lender, inter alia, made false representations concerning the amount, type, and terms of a mortgage loan.  The plaintiffs allegedly attempted to obtain explanations of their loan on numerous occasions, and the defendant lender responded with false information.  The court held that the issue whether the defendant lender made affirmative misrepresentations in addition to the fraud that gave rise to the TILA claim was a factual issue that the court could not properly determine at the summary judgment stage.  See Foster v. EquiCredit Corp., 2001 WL 177188, at *2.  The court stated that a contrary holding "would run the risk of rewarding wayward defendants for evading the law's

29

purposes for a statutorily proscribed time.  In short, '[a]llowing lenders to violate TILA, but avoid liability if they successfully conceal the violation from the debtor for a year, would undermine the core remedial purpose of TILA.'"  Id. (quoting Ramadan, 156 F.3d at 502.)

In this case, plaintiffs attempted to gather information from Coastal after September 11, 2001.[14]  Coastal never responded.  In November 2001, Banknorth provided loan documents to plaintiffs, and plaintiffs allege these documents contained terms different from those of the original agreement and also contained a forged signature.

There is no evidence of record that Coastal made any affirmative misrepresentations, other than what was disclosed at the time the loan agreement was entered into and what was included in the loan documents submitted to Banknorth; Coastal's failure to respond to plaintiffs' inquiries after September 11, 2001 cannot be considered an *affirmative* misrepresentation.  Even if the statute of limitations could be tolled based upon Coastal's supposed concealment, the true terms of the loan were revealed to plaintiffs in November 2001, when Banknorth provided the loan documents to plaintiffs.  At that time, defendant's position on the terms of the loan was no longer concealed, and the limitations period could not be tolled thereafter.  Even assuming the limitations period could be tolled from September 2001 to November 2001, the statute of limitations expired in November 2002.  Plaintiffs did not commence the lawsuit until April 7, 2006; therefore, plaintiffs' TILA claims were untimely filed.  Defendant is entitled to summary judgment with respect to count II.

### III.  Count III

---

[14] If a jury determines that an agency relationship existed between Coastal and defendant, wrongdoing by Coastal during the period of the agency relationship arguably would be attributable to defendant.  See Part I(C).

In count III of plaintiffs' third amended complaint, they alleged violations of the federal Real Estate Settlement Procedure Act, 12 U.S.C. §§ 2601-17 ("RESPA").[15]  Plaintiffs claim defendant, acting jointly or in concert with Coastal, violated § 2605, by transferring a federally related mortgage loan without satisfying the specific disclosure and notice requirements.[16] Plaintiffs allege that Banknorth, as the transferee, failed to serve proper notice upon plaintiffs within fifteen days after the effective date of transfer, September 6, 2001.  Sections 2605(b)(2) and 2605(c)(2) are virtually identical sections with respect to the time within which a transferor or transferee has to notify an applicant of the assignment, sale, or, transfer of loan servicing.  The difference between the sections is that the former pertains to the transferor (Coastal) and the latter applies to the transferee (Banknorth).[17]  For purposes of the present summary judgment motion, § 2605(c)(2) is the relevant provision.  Defendant moved for summary judgment with respect to count III, raising three arguments: (A) the statute of limitations bars plaintiffs' RESPA claim, (B) Finian Poskin does not have standing to sue with respect to count II, and (C) the actions of Coastal cannot be attributed to defendant.  The court finds that the statute of limitations bars plaintiffs' claim at count III, and the court need not discuss defendant's other two arguments.

---

[15] Count III was brought against all defendants.  Neither Coastal nor the individual defendants have moved for summary judgment.

[16] For purposes of § 2605, Coastal is the transferor and Banknorth is the transferee.

[17] Section 2605(b)(2) provides in relevant part that "[e]xcept as provided under subparagraphs (B) and (C), the notice required under paragraph (1) shall be made to the borrower not less than 15 days before the effective date of transfer of the servicing of the mortgage loan (with respect to which such notice is made)."  Section 2605(c)(2) provides in relevant part that "[e]xcept as provided in subparagraphs (B) and (C), the notice required under paragraph (1) shall be made to the borrower not more than 15 days after the effective date of transfer of the servicing of the mortgage loan (with respect to which such notice is made)."

**A.  Whether the applicable statute of limitations bars plaintiffs' claim against defendant.**

With respect to count III, defendant alleges that the statute of limitations bars plaintiffs' claim.  The statute of limitations for RESPA claims is set forth in § 2614, which provides a three-year statute of limitations.  12 U.S.C. § 2614.  For the same reasons as those set forth in Part II(A), plaintiffs' invocation of the federal discovery rule is inappropriate with respect to count III.  It likewise follows that, even if the limitations period is tolled equitably with respect to count III, plaintiffs' claim at count III was untimely filed.  Assuming the transfer of the mortgage from Coastal to Banknorth was fraudulently concealed from September 2001 to November 2001, plaintiffs learned about the transfer in November 2001.  Accordingly, with respect to count III the statute of limitations expired no later than November 2004.  This action was not brought until April 7, 2006, well beyond the expiration of the limitations period.  Defendant is entitled to summary judgment with respect to count III.

## IV.  <u>Count IV</u>

Count IV of plaintiffs' complaint alleges a violation 42 PA. CONS. STAT. § 8351, the Pennsylvania state tort of wrongful use of civil proceeding.[18]  Plaintiffs argue that defendant wrongfully, and in a grossly negligent manner, initiated civil actions in replevin and mortgage foreclosure against plaintiffs.  Plaintiffs maintain that defendant proceeded with the replevin and foreclosure actions with knowledge of the fraud underlying the loan in question.  Plaintiffs also argue that defendant had no basis to initiate actions against Finian Poskin, who was not a party to the loan transaction.  Plaintiffs believe that defendant's voluntary dismissal of the actions is

---

[18] 42 PA. CONS. STAT. § 8351 is also referred to as the "Dragonetti Act."  <u>Allen v. Pa. Soc'y for Prevention of Cruelty to Animals</u>, 488 F. Supp.2d 450, 470 (M.D. Pa. 2007).

evidence of defendant's lack of probable cause to initiate the replevin and foreclosure actions.

Defendant raised two arguments in support of its motion for summary judgment with respect to

plaintiffs' malicious prosecution claim: (A) the claim is preempted by federal law, and (B)

plaintiffs have not adduced sufficient evidence to establish a prima facie case.

### A.  Whether federal preemption bars the state law claim asserted by plaintiffs.

Defendant argues that the NBA preempts the assertion of the claim in count IV.  The

NBA governs the business activities of national banks, and the Office of the Comptroller of

Currency ("OCC") is responsible for implementing regulations pursuant to that act.  Watters v.

Wachovia Bank, N.A., 550 U.S. 1, 10-13 (2007).  Federal banks are subject to the laws of a state

insofar as those state laws do not conflict with the language and purpose of the NBA.  Id.  States

may regulate the activities of national banks unless regulation would prevent or interfere with the

national bank's exercise of powers enumerated or incidental under the NBA.[19]  Id.  With respect

to the NBA, federal preemption of state law protects national banks from unduly burdensome

and duplicative state regulation.  Id.

The NBA does not address claims of malicious prosecution against national banks.  The

tort of malicious prosecution does not conflict with the language or purpose of the NBA.  42 PA.

CONS. STAT. § 8351 falls under one of the subjects that section 7.4009(c)(2) of Title 12 of the

Federal Code of Regulation indicates is "not inconsistent" with the power of national banks.  12

C.F.R. § 7.4009(c)(2) ("State laws on the following subjects are not inconsistent with the powers

of national banks and apply to national banks to the extent that they only incidentally affect the

---

[19] 12 C.F.R. § 7.4009(c)(2) provides in relevant part that "[s]tate laws on the following subjects are not inconsistent with the powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national bank powers: Contracts; Torts; Criminal law; Rights to collect debts; Acquisition and transfer of property . . . ."

exercise of national bank powers: . . . Torts."); see Baldanzi v. WFC Holdings Corp., No. 07 Civ. 9551, 2008 WL 4924987, at *2 (S.D.N.Y. Nov. 14, 2008) ("In contrast to findings of federal preemption in cases involving specific state regulations that conflict with the NBA, causes of action sounding in contract, consumer protection statutes and tort have repeatedly been found by federal courts not to be preempted").  Under those circumstances, this court concludes that 42 PA. CONS. STAT. § 8351 is consistent with the language and purpose of the NBA, and it does not interfere with the OCC's regulation of national banks

**B.  Whether plaintiffs failed to establish a prima facie case of malicious prosecution.**

Defendant argues that plaintiffs failed to establish a prima facie case of wrongful use of civil proceeding.  To prove wrongful use of civil proceedings a plaintiff must show: (1) defendant acted in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and (2) the proceedings have terminated in favor of the person against whom they are brought.  42 PA. CONS. STAT. § 8351.

With respect to the second element, defendant cites Gourley v. Meadville Production Credit Ass'n, 45 Pa. D. & C.3d 155, 160 (Warren County Ct. of C.P. 1987), in which the court held that the voluntary discontinuance of an action is not a favorable termination.  This court, however, found several decisions to the contrary.  "Favorable termination within the meaning of the wrongful use of civil proceeding statute need not be an adjudication on the merits; favorable termination can occur as the result of a voluntary dismissal of the underlying proceeding or an abandonment of the proceeding."  Doby v. DeCrescenzo, No. CIV. A. 94-3991, 1996 WL 510095, at *16 (E.D. Pa. Sept. 9, 1996) (citing Shaffer v. Stewart, 473 A.2d 1017, 1020-21 (Pa. Super. Ct. 1984); see Woodyatt v. Bank of Old York Road, 182 A.2d 500, 501 (Pa. 1962)); see

also Di Loreto v. Costigan, 600 F. Supp. 2d 671, 689-90 (E.D. Pa. 2009).  Plaintiff can satisfy the second element by showing defendant voluntarily dismissed the replevin and mortgage foreclosure actions.

Under the first element, the filing of suit by defendant must "be either 'grossly negligent' or 'without probable cause and primarily for the purpose other than that of securing the proper . . . adjudication of the claim in which the proceedings are based.'"  Di Loreto, 600 F. Supp. 2d at 690 (quoting 42 PA. CON. STAT. § 8351(a)(1)).  "[A]n action for wrongful use of civil proceedings pursuant to the Dragonetti Act does not require a *prima facie* showing of actual malice, but, such action requires proof that the defendant acted in a grossly negligent manner."  Hart v. O'Malley, 781 A.2d 1211, 1218 (Pa. Super. Ct. 2001).  Gross negligence has been defined as "a lack of slight diligence or care, or a conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party, who may typically recover exemplary damages."  Di Loreto, 600 F. Supp. 2d at 690 (quoting Hart, 781 A.2d at 1218).

Here, viewing the evidence in a light most favorable to plaintiffs, a genuine issue of material fact exists regarding whether defendant acted in a grossly negligent manner.  The loan documents included in plaintiffs' loan application contained employment information that was allegedly false; if defendant had attempted to verify this information, it would have discovered that plaintiffs did not have the income indicated.  Prior to initiating the foreclosure and replevin actions against plaintiffs, defendant knew that Coastal had falsified information on loan applications for other individuals.  In addition, Kenneth Poskin filed an affidavit of forgery.  Defendant's own policy provided that it would not force a borrower to repay a loan if the loan was fraudulent and the borrower filed the appropriate affidavits of forgery with defendant.

Although Kenneth Poskin's affidavit of forgery contained little information and did not allege the extent of the fraud that is now claimed, a jury question exists whether defendant was grossly negligent in the institution of the actions, given plaintiffs' complaints of forgery and the knowledge of prior wrongdoing on the part of Coastal.  A reasonable finder of fact could conclude that, based upon the information available to defendant, defendant acted in a grossly negligent manner.

## V.  Count V

Count V of plaintiffs' third amended complaint alleges a violation of § 201-3 of the UTPCPL.  73 PA. CONS. STAT § 201-3.  Specifically, plaintiffs allege that defendant, acting jointly or in concert with Coastal, engaged in unfair or deceptive practices by fraudulently misrepresenting Kenneth Poskin's employment history and earnings.  Plaintiffs also allege that defendant's approval of the unauthorized amount of the loan created a likelihood of confusion and misunderstanding as defined in "§ 201-2(xvii)."[20]  Id.  Defendant moves for summary

---

[20] Plaintiffs cite "73 PA. CONS. STAT. 201-2(xvii)," which is not a codified statute.  Plaintiffs likely meant 73 PA. CONS. STAT. § 201-2(4)(xvii) which provides that:

> [m]aking solicitations for sales of goods or services over the telephone without first clearly, affirmatively and expressly stating: the identity of the seller; that the purpose of the call is to sell goods or services; the nature of the goods or services; and that no purchase or payment is necessary to be able to win a prize or participate in a prize promotion if a prize promotion is offered

is an "unfair method[] of competition" or an "unfair or deceptive act[] or practice[]."  Plaintiffs allege in their complaint that the violation of UTPCPL was the creation of a likelihood of confusion and misunderstanding.  The "likelihood of confusion or misunderstanding" is not contained in 73 PA. CONS. STAT. § 201-2(4)(xvii).  That phrase is used in other subsections.  See, e.g., 73 PA. CONS. STAT. § 201-2(4)(ii) ("Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services"); 73 PA. CONS. STAT. § 201-2(4)(iii) ("Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another"); 73 PA. CONS. STAT. §

judgment on count V and raises three arguments in support: (A) the claim is preempted by federal law, (B) Finian Poskin does not have standing to sue with respect to count V, and (C) the actions of Coastal cannot be attributed to defendant.

**A.  Whether federal preemption bars the state law claims asserted by plaintiffs.**

Defendant argues that federal preemption bars the Pennsylvania state law claim.  The NBA preempts borrowers' claims against national banks for violation of UTPCPL based on excessive annual interest rate charges.  <u>Basile v H&R Block, Inc.</u>, 897 F. Supp. 194, 198-99 (E.D. Pa. 1995).  Defendant asserts that <u>Basile</u> stands for the proposition that the NBA preempts all UTPCPL claims, but that conclusion is not correct; the National Bank Act preempts UTPCPL claims "inasmuch as plaintiffs' unfair trade practices claim arises from the bank's interest rate charges."  <u>Id.</u>  Also, as discussed above, the NBA will not preempt a state claim unless the state claim contradicts the language or purpose of the NBA.  <u>Watters v. Wachovia Bank N.A.</u>, 550 U.S. at 10-13.

Here, plaintiffs' count V claim is not based upon usurious interest rate charges.  Count IX specifically addresses usurious interest charges.  Count V is premised upon § 201-3 of the UTPCPL (as defined in the subsections of § 201-2(4)), and does not address interest rate charges. Regardless whether plaintiffs cited to the correct provision of § 201-2(4), no parts of that section would be preempted by the NBA.  All the subsections of § 201-2(4) deal with unfair methods of competition and unfair or deceptive acts or practices.

In <u>Rose v. Chase Bank USA, N.A.</u>, 513 F.3d 1032 (9th Cir. 2008), the Court of Appeals for the Ninth Circuit stated:

---

201-2(4)(xxi) ("Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding").

> States are permitted to regulate the activities of national banks where doing so
> does not prevent or significantly interfere with the national bank's . . . exercise of
> its powers.  But when state prescriptions significantly impair the exercise of
> authority, enumerated or incidental under the NBA, the State's regulations must
> give way.

Id. at 1037.  The court of appeals noted that the one of the powers the NBA bestowed upon national banks was the power to "loan money on personal security," which includes extensions of credit to cardholders via convenience checks.  A California statute imposed on banks a duty to disclose finance charges when extending credit to cardholders through the use of a preprinted check or draft, and also prohibited banks from engaging in unfair or deceptive business practices when granting such loans.  The court of appeals held that this statute was preempted by the NBA, because it impaired the national bank's exercise of its power to loan money.  Id. at 1038.

In Jefferson v. Chase Home Finance, No. C 06-6510, 2008 WL 1883484, at *7 (N.D. Cal. Apr. 29, 2008), which was decided after Rose,[21] the District Court for the Northern District of California determined that the NBA does not preempt the entire field of "banking," but rather federal regulations issued by the OCC set forth "the preemptive reach of national banking law." Id. at *8.  The court focused on 12 C.F.R. §§ 7.4009 and 34.4, which provide that "banks may make real estate loans without state law limitations regarding terms of credit, disclosure and advertising, processing and servicing of mortgages, repayments, and rates of interest on loans." Id. at *10.  The court noted that "both regulations expressly preempt state laws that obstruct, impair, or condition a bank's ability to exercise its real estate lending powers."  Id. at *9 (internal citations omitted).  At issue in Jefferson were three general consumer protection laws, California's Consumer Legal Remedies Act, CAL. CIV. CODE §§ 1750 et seq., False Advertising

---

[21] Rose was decided on January 23, 2008.

Act, CAL. CIVIL CODE §§ 17500 et seq., and Unfair Competition Law, CAL. BUS. & PROF. CODE §§ 17200 et seq. Id. at *1. The court held

> that such laws of general application, which merely require all businesses (including banks) to refrain from misrepresentations and abide by contracts and representations to customers do not impair a bank's ability to exercise its lending powers. They only "incidentally affect" the exercise of a Bank's powers, do not fall into the enumerated categories of § 34.4(a), and are therefore not preempted.

Id. at *10. The court distinguished the state laws in issue from those "state laws specifically directed at banking or lending," which the court observed were held to be preempted. Id. at *13.

Here, the statute at issue, the UTPCPL, is a law of general applicability, and not targeted directly at banking or lending. The court concludes that, following the rationale of Jefferson which is persuasive, the provisions of the UTPCPL at issue for count V are distinguishable from that at issue in Rose, and are not preempted. Defendant failed to point out any provision of the NBA that is duplicative of the protections against unfair or deceptive practices enumerated in the UTPCPL, and defendant did not argue that § 201-2(4) contradicted the language or purpose of the NBA. In its briefs, defendant only argues that usury laws are preempted by the NBA. Accordingly, the NBA does not preempt count V. See Watters v. Wachovia Bank N.A., 550 U.S. at 10-13; Basile v H&R Block, Inc., 897 F. Supp. at 198-99.

**B. Whether the court should dismiss the claims of plaintiff Finian Poskin because she lacks standing to sue in count V.**

Next, defendant alleges that Finian Poskin does not have standing to sue for the violation of the UTPCPL in count V. Section 201-3 of the UTPCPL recognizes a claim for any person who purchases or leases goods or services.

> *Any person who purchases or leases goods* or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by the Unfair Trade Practices and

Consumer Protection Law (UTPCPL) may bring a private action to recover actual damages or $100, whichever is greater.

18A SUMMARY OF PA. JUR. 2D COMMERCIAL LAW § 19:53 (emphasis added).  Because there is no evidence that Finian Poskin is a purchaser or lessor of goods or services, she does not have standing to sue under section 201-3.  Summary judgment will be granted in favor of defendant against Finian Poskin with respect to this claim.

### C.  Whether an agency relationship exists between Banknorth, Coastal or individual defendants.

Defendant argues that there was no agency relationship between Coastal and Banknorth. The relevant case law on agency relationship is set forth in Part I(C), addressing count I in the discussion.  As noted above, the issue of agency in this case must be resolved by a jury.

## VI. <u>Count VIII</u>

Count VIII of plaintiffs' complaint alleges a common law tort claim for breach of fiduciary duty or breach of duty of good faith and fair dealing.  Plaintiffs argue that defendant indirectly breached the fiduciary duty it owed to plaintiffs by approving the fraudulent documentation by Coastal.  Plaintiffs allege that defendant breached its duty of good faith and fair dealing that it owed to plaintiffs by continuing to pursue collection of debt with knowledge of the fraudulent nature of the loan.  With respect to count VIII, defendant moved for summary judgment asserting four arguments: (A) plaintiff's claim at count VIII is barred by the statute of limitations, (B) the claim is preempted by federal law, (C) Finian Poskin does not have standing to sue with respect to count VIII, and (D) the actions of Coastal cannot be attributed to defendant.

A. **Whether the applicable statute of limitations bars plaintiffs' claim against defendant.**

Defendant argues that the statute of limitations statute bars plaintiffs' breach of fiduciary duty or breach of good faith and fair dealing claims. The common law torts in count VIII are subject to a two-year limitations period. 42 PA. CONS. STAT. § 5524; see Wise v. Mortgage Lender Network USA, Inc., 420 F. Supp. 2d 389, 395 (3d Cir. 2006). Plaintiffs assert that their claim is timely because they did not discover the extent of the injury that forms the basis of the claim until discovery in the present case.

Under Pennsylvania's discovery rule, a claim will accrue when a plaintiff knows or reasonably should have known of the causal relationship between injury and conduct causing the injury. Urland By & Through Urland v. Merrell-Dow Pharms., Inc., 822 F.2d 1268, 1275 (3d Cir. 1987). When the underlying events that form the basis of the lawsuit concern fraud or deceit, "the statute of limitations is tolled until such time as the fraud has been revealed, or should have been revealed by the exercise of due diligence by the plaintiff." Wise, 420 F. Supp. 2d at 395. Determining when a plaintiff discovered his injury was caused by fraud is usually a question for the jury to decide because it requires a fact-specific analysis. Wilson v. El-Daief, 964 A.2d 354, 362 (Pa. Super. Ct. 2009).

1. **Breach of fiduciary duty concerning fraudulent loan documents**

Here, plaintiffs allege that they did not realize the depth of the fraud until discovery in the present case. The relevant inquiry, however, focuses on when plaintiffs received actual or constructive knowledge of the fraud, without regard to the extent of the fraud. As earlier explained in Part II(A), defendant provided the alleged fraudulent documentation to plaintiffs in November 2001, and thus plaintiffs had knowledge at that time that defendant approved the fraudulent Coastal documentation.

41

The accrual of the limitations period with respect to plaintiffs' claim concerning the fraudulent loan documentation commenced no later than November 2001, and thus, count VIII, to the extent it alleges that the approval of loan contract itself breached the duty of good faith and fair dealing, is barred by the statute of limitations.  The statute of limitations for such a claim would have expired no later than November 2003, and the action was not brought until April 7, 2006.

### 2.   Breach of duty of good faith and fair dealing

Plaintiffs claim in count VIII that defendant breached the duty of good faith and fair dealing by pursuing collection of the debt, despite knowledge of plaintiffs'  allegedly verifiable complaints that the loan was fraudulent.  Defendant's final effort to collect on the loan was the replevin and foreclosure action, which was voluntarily dismissed without prejudice on June 28, 2005.  Plaintiffs filed this suit within two years of that date, and therefore count VIII was timely brought.  Accordingly, defendant's motion for summary judgment with respect to the claims for breach of good faith and fair dealing in count VIII is denied to the extent defendant relies upon the statute of limitations.

### B.   Whether federal preemption bars the state law claims asserted by plaintiffs.

Next, defendant argues that the NBA preempts the claims in count VIII.  These common law claims are not inconsistent with the language or purpose of the NBA and do not interfere with the OCC's regulation of national banks.  The NBA does not address claims for breach of fiduciary duty or good faith and fair dealing.  Further, these claims fall under one or more of the subjects that § 7.4009(c)(2) of Title 12 of the Federal Code of Regulations indicates are not

inconsistent with the power of national banks.[22]  See 12 C.F.R. § 7.4009(c)(2).

Defendant fails to point to any decisions that have held that claims for breach of duties of good faith and fair dealing are preempted by the NBA.  To the contrary, the case law recognizes that claims similar to plaintiffs' count VIII claim are not preempted.  See, e.g., Great Western Resources, L.L.C. v. Bank of Ark., N.A., No. 05-CV-5152, 2006 WL 626375, at *3 (W.D. Ark. Mar. 13, 2006) (holding "that plaintiffs' claims for breach of contract, violations of the Arkansas Deceptive Trade Practices Act, conversion, and breach of implied covenant of good faith are not subject to complete preemption [by the NBA]").  Decisions that hold the NBA preempts claims for breach of duties of good faith and fair dealing concern employment contracts between banks and bank executives; the NBA specifically includes a dismissal-at-will provision for these employees.  See, e.g., Lavelle v. BankAmerica Corp., 78 Cal. Rptr. 2d 609, 618-20 (Cal. Dist. Ct. App. 1998), disagreed with on other grounds by Peatros v. Bank of America NT & SA, 80 Cal. Rptr. 2d 911 (Cal. Dist. Ct. App. 1998).  The mortgage loan contract at issue in this case is distinguishable from an employment contract, and defendant does not argue that any NBA provision specifically governs mortgage loan contracts.  Summary judgment on this basis is therefore denied.

### C.  Whether the court should dismiss the claims of plaintiff Finian Poskin because she lacks standing to sue in count VIII.

Defendant argues that Finian Poskin does not have standing to assert the claims in count VIII.  Fiduciary duties and the duties of good faith and fair dealing in the context of this case arise from the existence of a contract.  See New Concept Beauty Academy, Inc. v. Nationwide Mut. Ins. Co., No. 97-5406, 1997 WL 746203, at **2-3 (E.D. Pa. 1997); 1 GERALD L.

---

[22] Insofar as breach of fiduciary duty and breach of good faith and fair dealing are actions either in contract or tort, 12 C.F.R. § 7.4009(c)(2) acknowledges that those claims are not inconsistent with the power of national banks.

BLANCHARD, LENDER LIABILITY: LAW, PRACTICE, AND PREVENTION § 2:7 (2d ed. 2003) ("The concept that parties to a contract owe each other the obligation of good faith in the performance of that contract is one which permeates American contract law.").  A loan transaction is a contract between the borrower and the lender.  Weiner v. Bank of King of Prussia, 358 F. Supp. at 690-91.  Because count VIII is based upon a loan contract to which Finian Poskin is not a party, Finian Poskin does not have standing to sue under count VIII.[23]  Summary judgment will be granted in favor of defendant against Finian Poskin with respect to this claim.

### D.  Whether an agency relationship exists between Banknorth, Coastal, or individual defendants.

Defendant argues that there was no agency relationship between Coastal and Banknorth. The analysis of the relevant issues with respect to whether an agency relationship exists in this situation is set forth under Part I(C) of this opinion.  As noted above, the issue of agency should not be decided as a matter of law on summary judgment because plaintiffs adduced sufficient evidence to establish a triable issue of fact.

## VII. Count IX

Plaintiffs allege that defendant attempted to collect a usurious interest rate in violation of 41 PA. CONS. STAT. § 301[24] by attempting to collect a 10.396 percent interest rate on the $39,042.83 mortgage loan.  Plaintiffs allege that defendant attempted to collect the usurious

---

[23] See the earlier discussion regarding Finian Poskin's standing in Parts I(B) and V(B).

[24] 41 PA. CONS. STAT § 301(b) provides in relevant part that:

> [t]he maximum lawful rate of interest for residential mortgages, as defined in this act, entered into or contracted for during any calendar month shall be equal to the Monthly Index of Long Term United States Government Bond Yields for the second preceding calendar month plus an additional two and one-half per cent per annum rounded off to the nearest quarter of one per cent per annum.

interest rate as late as 2006.  Defendant raises three arguments in support of summary judgment with respect to count IX: (A) the statute of limitations statute bars the plaintiffs' claim for violation of the Pennsylvania usury law, (B) the state law usury claim is preempted by federal law, and (C) Finian Poskin lacks standing to sue for count IX.  The court finds that plaintiffs' usury law claim is preempted by the NBA, and summary judgment will be granted on that basis. The court need not address the other arguments.

### A.  Whether federal preemption bars the state law claims asserted by plaintiffs.

Defendant correctly argues that the NBA completely preempts state usury claims. Beneficial Nat'l. Bank v. Anderson, 539 U.S. 1, 9-11 (2003).  The NBA specifically governs the interest rate that a national bank may charge.  12 U.S.C. § 85; see Basile v H&R Block, Inc., 897 F. Supp. at 198-99.  The NBA also governs damages for violations of § 85.  See 12 U.S.C. § 86. Plaintiffs in their brief in opposition to the summary judgment motion acknowledge that the NBA preempts count IX.  The NBA's preemption, however, does not end the inquiry.

When the NBA completely preempts state claims, "the result is to convert complaints purportedly based on the preempted state law into complaints stating federal claims from their inception."  In re Cmty. Bank of N. Va., 418 F.3d 277, 290 (3d Cir. 2005) (quoting Krispin v. May Dep't Stores Co., 218 F.3d 919, 922 (8th Cir. 2000)).  The Supreme Court

> has concluded that the preemptive force of a statute is so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule . . . .   Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law.

In re Cmty. Bank of N. Va., 418 F.3d at 294 (quoting Caterpillar Inc. v. Williams, 482 U.S. 386, 393 (1987)).  The Supreme Court has further held that

> [b]ecause §§ 85 and 86 provide the exclusive cause of action for [usury] . . . claims, there is, in short, no such thing as a state-law claim of usury against a national bank.  Even though the complaint makes no mention of federal law, it unquestionably and unambiguously claims that petitioners violate usury laws.  This cause of action against national banks only arises under federal law and could, therefore, be removed under § 1441.

In re Cmty. Bank of N. Va., 418 F.3d at 295 (quoting Beneficial Nat'l Bank, 539 U.S. at 11.

Here, 12 U.S.C. § 85 preempts 41 PA. CONS. STAT § 301.  The removal of count IX is not at issue in this case because it was originally filed in federal court, but the court nonetheless will analyze plaintiffs' 41 PA. CONS. STAT. § 301 claim as the appropriate federal claim.  Accordingly, the court reads count IX of plaintiffs' complaint as asserting a violation of 12 U.S.C. § 85.  That section prohibits the imposition of an interest rate above the maximum lawful interest rate "allowed by the laws of the State, Territory, or District *where the bank is located*."  12 U.S.C. § 85 (emphasis added).

In Marquette Nat. Bank v. First of Omaha Service Corp., 439 U.S. 299, 303-07 (1978), a bank solicited Minnesota residents for credit cards.  The interest rate charged on the cards, however, was greater than the interest rate permitted by Minnesota law.  The cardholders sued the bank pursuant to 12 U.S.C. § 85.  Id. at 309-10.  The Supreme Court held that the applicable interest rate was that provided for by Nebraska law, not Minnesota law.  In analyzing where the bank was "located," the court observed that the NBA requires a national bank to state in its organization certificate "[t]he place where its operations of discount and deposit are to be carried on, designating the State, Territory, or district, and the particular county and city, town, or village." Id. at 309 (quoting 12 U.S.C. § 22).  In Marquette, the charter address of the bank was in Omaha, Douglas County, Nebraska.  Id. at 309.  The Court stated that the bank "cannot be deprived of [the location on the organization certificate] merely because it is extending credit to residents of a foreign State." Id. at 310.

Plaintiffs argue that the statutory maximum interest rate applicable is that rate provided for by Pennsylvania law.  Plaintiffs, however, failed to present any evidence that Banknorth is "located" in Pennsylvania.  Plaintiffs did not adduce evidence of an organization certificate.  All evidence of record, such as defendant's mailing addresses, point to Banknorth offices in Maine.  There is no argument or evidence with respect to the maximum lawful interest rate under the laws of Maine.  Because plaintiffs failed to adduce sufficient evidence with respect to Count IX, the court grants defendant's motion for summary judgment.


**VIII. <u>Defendant's Counterclaim</u>**

Defendant moved for summary judgment on its counterclaim for unjust enrichment, claiming that plaintiffs were unjustly enriched in the amount of $33,094,48.  Defendant claims, and plaintiffs do not deny, that defendant paid out approximately $29,492.98 to Kenneth Poskin's various creditors.  <u>Id.</u>  Defendant claims that plaintiffs received the benefit of closing costs associated with loan in the amount of $3,601.50.  <u>Id.</u>  Plaintiffs raise four arguments in response to defendant's motion for summary judgment with respect to defendant's unjust enrichment counterclaim: (A) Finian Poskin cannot be liable for unjust enrichment, (B) the statute of limitations has expired, barring defendant's unjust enrichment claim, (C) defendant had an adequate remedy at law, barring the unjust enrichment claim, and (D) "unclean hands" bars defendant's claim.

### A.  Whether Finian Poskin can be liable to defendant for unjust enrichment.

First, plaintiffs argue that Finian Poskin is not liable for the debts incurred in Kenneth Poskin's name.  According to Pennsylvania law, as applied to the present case, the elements of unjust enrichment are: (1) a benefit conferred on the Poskins by Banknorth; (2) appreciation of

the benefit by the Poskins; and (3) acceptance and retention of such benefits under circumstances where retention of the benefit would be unjust.  Sovereign Bank v. BJ's Wholesale Club, Inc., 533 F.3d. 162, 180 (3d Cir. 2008).

Although Finian Poskin contacted Randy McKinney, there is no evidence Finian Poskin entered into any contracts with Coastal or Banknorth.  Furthermore, there is no evidence of record that any creditors of Finian Poskin were paid from monies obtained from defendant's mortgage loan; Hudson United was a creditor of Kenneth Poskin, and all credit card bills were addressed to Kenneth Poskin.  All debts paid from the loan funds, therefore, were in Kenneth Poskin's name.

Unless Kenneth Poskin's creditors could have attempted to collect from Finian Poskin in order to satisfy the debts that defendant paid, the payment of Kenneth Poskin's debt did not enrich Finian Poskin.  A long-established principle recognizes that a husband's creditor may not claim money or property that a wife acquired separately from her husband.  See Roger v. Fales, 5 Pa. 154 (Pa. 1847), overruled on other grounds by Good v. Mylin, 8 Pa. 51 (Pa. 1848).  Even if the wife's money is intermingled with the husband's money, the husband's creditor still cannot claim money that the wife amassed on her own.  See id.

Here, there is no evidence that any of the elements for unjust enrichment can be met with respect to Finian Poskin.  Defendant conferred no benefit on Finian Poskin by paying off debt for which she could not be liable.  Because the first element of unjust enrichment is not satisfied, the other two necessarily fail; there was no benefit to be appreciated, accepted, or retained by Finian Poskin.  Accordingly, defendant's motion for summary judgment with respect to its counterclaim is denied to the extent defendant asserts the counterclaim against Finian Poskin.

### B.  Whether the applicable statute of limitations bars defendant's unjust enrichment counterclaim.

Plaintiffs also argue that the statute of limitations bars the counterclaim.  Under Pennsylvania law, a claim for unjust enrichment has a four-year limitations period.  42 PA. CONS. STAT. § 5525; see Colonial Assurance v. Mercantile and Gen. Reinsurance, 130 F. App'x 607, 609 (3d Cir. 2005).  Even when the statute of limitations bars a counterclaim, however, equitable recoupment may be appropriate to allow defendant to use his claim to diminish the amount of recovery the plaintiff may be awarded.  Kronz v. Cech, 175 B.R. 585, 595 (Bankr. W.D. Pa. 1994).  "Equitable recoupment permits a party to assert a defense which could not be asserted affirmatively as a counterclaim because the statute of limitations has run.  Such a defense is not barred by the statute of limitations so long as the main action brought by plaintiff is timely."  Id. (citing Bull v. U.S., 295 U.S. 247, 260-61 (1935)).

Here, the four-year limitations period had expired by the time the claim was filed. Kenneth Poskin stopped paying on his loan in 2002 or 2003 at the latest, and defendant did not file the unjust enrichment claim until March 10, 2008.  Nonetheless, defendant should be able to assert equitable recoupment at least as a defense to plaintiffs' claims against it.  Therefore, plaintiffs' reliance on the statute of limitations does not defeat the defendant's motion for summary judgment.

### C. Whether defendant is barred from asserting its counterclaim because it had an adequate remedy at law.

Next, plaintiffs argue that defendant cannot sue in equity because it had an adequate remedy at law, namely the replevin and foreclosure action.  Defendant correctly acknowledges that when an adequate remedy at law exists, a person cannot sue in equity.  Meehan v. Cheltenham Twp., 189 A.2d 593, 595 (Pa. 1963).  Even if a person is precluded from pursuing a replevin action because the limitations period has run, under most authorities, a party bringing a

replevin action can present evidence explaining why the suit was not instituted earlier in an effort to pursue an equitable remedy.  <u>See</u> <u>Jostan Aluminum Prods. Co., Inc. v. Mount Carmel Dist. Indus. Fund</u>, 389 A.2d 1160, 1164 (Pa. Super. Ct. 1978).  "[U]nder most authorities, the mere fact that the statute of limitations would bar a remedy at law is no ground in itself for applying to equity for relief unless plaintiff was prevented from suing by defendant's act."  <u>Id.</u> (quoting 30A C.J.S. <u>Equity</u> § 23c (1992) and citing 27A Am. Jur. 2d <u>Equity</u> § 93 (2008); <u>Kane v. Morrison</u>, 44 A.2d 53 (Pa. 1945).

Here, defendant alleges that its remedy at law was not justified by cost.  In the context of the present action, however, defendant may find it cost effective to pursue the equitable defense of recoupment in order to diminish damages that plaintiff may recover.  Because the limitations period has run on defendant's unjust enrichment claim, defendant can only defensively pursue the recovery of the benefit conferred.  Ultimately, plaintiffs' argument that defendant's counterclaim is barred because it had an adequate remedy at law is irrelevant because it has already been established that defendant can only pursue recovery of the benefit conferred defensively through equitable recoupment, and not as an independent action.  Therefore, defendant's summary judgment motion is not defeated by plaintiffs' assertion that defendant had an adequate remedy at law.

### D.  Whether the maxim of "unclean hands" extinguishes defendant's counterclaim.

Finally, plaintiff argues that defendant is not entitled to equitable relief because defendant has "unclean hands."  "Unclean hands" would preclude equitable relief because "[a] suitor in equity must come into court with clean hands and he must keep them clean after his entry and throughout the proceedings."  <u>Cent. Lewmar, L.P. v. Gentilin</u>, No. 03-4671, 2005 WL 1308235, at **6-7 (D.N.J. 2005) (quoting <u>A. Hollander & Son, Inc. v. Imperial Fur Blending Corp.</u>, 2 N.J.

235, 246 (1949)).  The maxim of "unclean hands" simply "gives expression to the equitable

principle that a court should not grant relief to one who is a wrongdoer with respect to the subject

matter in suit."  Cent. Lewmar, 2005 WL 1308235, at **6-7 (quoting Faustin v. Lewis, 85 N.J.

507, 511 (1981)).

The maxim of "unclean hands" may apply to defendant's equitable defense of

recoupment insofar as that maxim applies to all requests for equitable relief.  Plaintiffs set forth

facts sufficient to raise a genuine issue of material fact with respect to whether defendant

engaged in wrongdoing either individually or jointly with Coastal and other individuals.

Because the application of the maxim of "unclean hands" involves a factual determination

regarding defendant's wrongdoing, defendant is not entitled to summary judgment on its

counterclaim.

### Conclusion

After reviewing the undisputed and disputed material facts of the record, and for the

reasons set forth above, the court determines that Finian Poskin does not have standing to sue for

counts V, VIII, IX, or under 15 U.S.C. §§ 1679b(a)(1)(B)(ii) and §1679b(a)(2)(B)(ii) in count I.

Defendant's motion for summary judgment will be granted with respect to Finan Poskin's claims

in those counts.  With respect to counts II and III, the court grants defendant's motion for

summary judgment, because the statute of limitations expired for those claims prior to the

institution of this action by plaintiffs.  With respect to count IX, the court grants defendant's

motion for summary judgment, because plaintiffs' claim is preempted by federal law and, even

if the claim is treated as one under federal law, plaintiffs failed to adduce sufficient evidence to

create a genuine issue of material fact.  The court denies summary judgment with respect to

Finian Poskin's standing to sue for violation of §1679b(a)(4) in count I, and with respect to all

defendant's other arguments and counterclaim.

By the court:


/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge


Date: September 11, 2009